Document Number Case Number
001            05–C–0687–C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
11/21/2005 02:11:38 PM CST

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| AMS FUND, INC., Individually And On Behalf of All Others Similarly Situated, | § | Civil Action No. |
| | § | |
| Plaintiff, | § | |
| | § | **JURY TRIAL DEMANDED** |
| vs. | § | |
| | § | |
| GREAT WOLF RESORTS, INC., JOHN EMERY, JAMES A. CALDER, BRUCE D. NEVIASER, ELAN BLUTINGER, RANDY CHURCHEY, MICHAEL M. KNETTER, ALISSA N. NOLAN, HOWARD SILVER, AND MARC B. VACCARO, | § | |
| | § | |
| Defendants. | § | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF FEDERAL SECURITIES LAWS

Plaintiff, individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters, based on, inter alia, the investigation conducted by and through plaintiff's attorneys, which included, amongst other things, a review of the defendants' press releases, Securities and Exchange Commission ("SEC") filings by Great Wolf Resorts, Inc. ("Great Wolf Resorts" or the "Company") and media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      This is a securities class action on behalf of all persons and entities who purchased the common stock of Great Wolf Resorts pursuant or traceable to the Company's Initial Public Offering ("IPO") of common stock on December 14, 2004, and on behalf of all persons and entities who purchased or otherwise acquired Great Wolf Resorts securities between December 14, 2004 and July 28, 2005, inclusive (the "Class Period"), seeking to pursue remedies for violations of the federal securities laws against the Company and certain of its officers and/or directors.

2.      Defendants' registration statements issued in connection with the Company's IPO contained untrue statements of material fact or omitted to state a material fact required to be stated therein or necessary to make the facts stated therein not misleading as these statements related to state of the Company's internal controls and ability to provide financial guidance and forecasts. Moreover, defendants' false and misleading statements and active concealment of true facts, occurring within eight months of the IPO, regarding the Company's financial condition and business prospects served to maintain an artificially inflated price of Great Wolf Resorts's stock throughout the Class Period.

## JURISDICTION AND VENUE

3.     The claims asserted arise under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and t(a)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) thereunder, and §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77k, l(a)(2) and o).  Jurisdiction is conferred by § 27 of the Exchange Act (15 U.S.C. § 78aa), § 22(a) of the Securities Act (15 U.S.C. § 77v(a)) and 28 U.S.C. § 1331.  Venue is proper in this District pursuant to § 27 of the Exchange Act, and § 22 of the Securities Act, as Great Wolf Resorts and/or the Individual Defendants conduct business in this district and the wrongful conduct giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, took place in this District.

4.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

5.     Plaintiff AMS Fund, Inc., as set forth in the accompanying certification, incorporated by reference herein, purchased shares of Great Wolf Resorts stock at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

6.     Defendant Great Wolf Resorts claims that it is the largest owner, operator and developer in the United States of drive-to family resorts featuring indoor waterparks and other family-oriented entertainment activities, targeting families with children ranging in ages from 2 to 14 years old that live within a convenient driving distance from

its resorts. The Company claims in-house expertise and resources in development, management, marketing and financing activities, ownership of five existing Great Wolf Lodge resorts, one Blue Harbor Resort and Conference Center, a nautical-themed property and another Great Wolf Lodge resort that is under construction and scheduled to open for business during 2005. Defendant Great Wolf Resorts also expects to license and manage an additional Great Wolf Lodge resort in Niagara Falls, Ontario, as well as evaluate 12 to 14 additional markets for potential future development of Great Wolf Lodge resorts, six of which are in active site negotiation. The Company's principal executive offices are located at 122 West Washington Avenue, Madison, Wisconsin 53703.

7.     Defendant John Emery ("Emery") was, at all relevant times hereto, Chief Executive Officer ("CEO") and a director of Great Wolf Resorts. As CEO and director, Emery prepared, reviewed and signed the Company's Registration Statements, in connection with the Company's IPO.

8.     Defendant James A. Calder ("Calder") was, at all relevant times hereto, Chief Financial Officer ("CFO") of Great Wolf Resorts. As CFO, Calder prepared, reviewed and signed the Company's Registration Statements, in connection with the Company's IPO.

9.     Defendant Bruce D. Neviaser ("Neviaser") was, at all relevant times hereto, Chairman of the Board of Great Wolf Resorts. As Chairman, Neviaser prepared, reviewed and signed the Company's Registration Statements, in connection with the Company's IPO.

10.     Defendant Elan Blutinger ("Blutinger") was, at all relevant times hereto, a director of Great Wolf Resorts. As a director, Blutinger prepared, reviewed and signed the Company's Registration Statements, in connection with the Company's IPO.

11.     Defendant Randy Churchey ("Churchey") was, at all relevant times hereto, a director of Great Wolf Resorts. As a director, Churchey prepared, reviewed and signed the Company's Registration Statements, in connection with the Company's IPO.

12.     Defendant Michael M. Knetter ("Knetter") was, at all relevant times hereto, a director of Great Wolf Resorts. As a director, Knetter prepared, reviewed and signed the Company's Registration Statements, in connection with the Company's IPO.

13.     Defendant Alissa N. Nolan ("Nolan") was, at all relevant times hereto, a director of Great Wolf Resorts. As a director, Nolan prepared, reviewed and signed the Company's Registration Statements, in connection with the Company's IPO.

14.     Defendant Howard Silver ("Silver") was, at all relevant times hereto, a director of Great Wolf Resorts. As a director, Silver prepared, reviewed and signed the Company's Registration Statements, in connection with the Company's IPO.

15.     Defendant Marc B. Vaccaro ("Vaccaro") was at all relevant times hereto a director of Great Wolf Resorts. As a director, Vaccaro prepared, reviewed and signed the Company's Registration Statements, in connection with the Company's IPO.

16.     The Defendants enumerated above in ¶¶ 7-15 are referred to collectively herein as the "Individual Defendants."

## THE INDIVIDUAL DEFENDANTS' CONTROL OVER GREAT WOLF RESORTS AND ITS COMMUNICATIONS TO THE PUBLIC CONCERNING FINANCIAL RESULTS

17.     Each of the above officers and directors of Great Wolf Resorts, by virtue of their high-level positions with the Company and committee memberships, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and

misleading press releases, statements and information alleged herein, knew or recklessly disregarded that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

18.    In addition to the above-described involvement, each Individual Defendant had knowledge of Great Wolf Resorts's problems. Each defendant was motivated to conceal such problems. Defendant Calder, serving as CFO, provided for financial reporting and communications with the market. Defendant Calder directed communications with the market, including conference calls, as well as internal reports showing Great Wolf Resorts's forecasted and actual growth. Defendant Emery, serving as CEO, also provided for communications with the market, including conference calls, as well as reports on Company operations, financing and press releases issued by the Company. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

**DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT**

19.    Each defendant is liable for (a) making false statements, *or* (b) failing to disclose adverse facts known to him or her about Great Wolf Resorts. Defendants' fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Great Wolf Resorts's publicly traded securities was a success, as it (a) deceived the investing public regarding Great Wolf Resorts's prospects and business; (b) facilitated sales of 14 million shares of the Company's stock at artificially inflated prices during the IPO; (c) artificially inflated the prices of Great Wolf Resorts's publicly traded securities; (d) maintained an artificially inflated price of the Company's stock to facilitate the sale of another 14 million restricted shares of the Company's stock, in connection with the "formation transactions" arm of the IPO; (e) maintained an artificially inflated price of the Company's stock going into the expiration of the IPO lockup period; and (f) caused

plaintiff and other members of the Class to purchase Great Wolf Resorts's publicly traded securities at artificially inflated prices.

## OVERVIEW OF THE FRAUD

20.    Unaware of the serious process, systems and internal control issues facing Great Wolf Resorts, investors purchased stock pursuant to registration statements containing untrue statements of material fact or omitting to state a material fact required to be stated therein or necessary to make the facts stated therein not misleading. At the root of these issues was the fact that the Company provided misleading, unreliable and unpredictable quarterly and annualized guidance based on its preferred non-GAAP EBITDA measure.

21.    Defendants lacked effective process management and systems essential for the accurate accounting of "revenue/operating" expenses, particularly its non-GAAP EBITDA measure. This problem persisted long after the IPO, resulting in overstatement of quarterly and annualized EBITDA projections. Defendants concealed the *tenuous nature* of their attempts to periodically determine the EBITDA measure with certainty, making their use of the measure *inherently unreliable for most business purposes.*

22.    Investors relied on EBITDA as defendants represented the utility of the measure for planning purposes, including the preparation of an annual operating budget, evaluation of operating performance, capacity to incur and service debt, fund capital expenditures to expand the business as one measure in determining the value of other acquisitions and dispositions.

23.    Since defendants' EBITDA number was inherently unreliable, both the Company's business prospects and in fact the value of the underlying business was in doubt, to the extent this defective measure was used for valuation purposes, *to convince investors to buy the Company's stock during the IPO.* Finally, defendants' use of the measure to meet "financial tests" required to obtain additional financing was misleading,

since defendants' ability to periodically determine the EBITDA measure was inherently unreliable.

24.     The Class Period begins on December 14, 2004, as the Company commenced its IPO, resulting in the sale of 14 million shares of the Company's stock, priced at $17.00 per share. On May 5, 2005, defendants issued quarterly annualized guidance based on its inherently unreliable EBITDA projections.

25.     In the final weeks of the Class Period, the truth began to be revealed. First, on June 14, 2005, defendants delivered a mixed message to analysts following the stock, "warning" investors just prior to the expiration of its IPO lockup period of an incremental change in the Company's quarterly and annualized EBITDA projections, while providing reasons to remain confident in the Company's future prospects. Far from causing alarm, the price of the stock remained inflated, as investors found reason for confidence in defendants' "prudent behavior," causing the interim price of the stock to rise nearly 10%, to $22.33 on July 22, 2005.

26.     Then, on July 28, 2005, investors were shocked as they learned the true magnitude of the Company's earnings shortfall and its cause - the inherent unreliability of defendants' EBITDA projections. Following the shocking revelations contained within defendants' conference call of July 28, 2005, investor confidence in the credibility of management to provide a true and accurate accounting of the Company's business prospects all but evaporated.

27.     Worse, analysts reached another shocking conclusion, that defendants *were fully aware of the true magnitude of the earnings miss when they were out marketing clients at the end of June, but failed to publicly disclose the materiality of the problem at that time.* On the news of July 28, 2005, the price of the Company's stock plunged $6.12, to $13.65, on extremely heavy volume of 6.0 million shares.

28.     During the Class Period, defendants knew and concealed:

- 8 -

(a)     deficient and defective internal operational controls were in existence at the Company;

(b)     the Company's deficient and defective internal operational controls concealed a true picture of the Company's financial progress and business prospects, both during and from a time prior to the beginning of the Class Period;

(c)     the Company's own earnings warning of June 14, 2005 understated the true extent of the Company's earnings shortfall and negative impacts to its 2005 guidance;

(d)     the Company's own false and misleading earnings warning served to maintain inflation of the price of the stock upon expiration of the lockup period for selling shareholders involved in formative transactions in connection with the IPO;

(e)     while the materiality of the issues was hidden from investors, an awareness of the true magnitude of the earnings miss colored marketing activities during the Class Period, and

(f)     investors would not learn the truth about the true nature of the Company's earnings shortfall, stalled business prospects or its deficient and defective internal operational controls until the end of the Class Period.

## BACKGROUND AND DEFENDANTS'
## PRE-CLASS STATEMENTS

29.     The formation of Great Wolf Resorts is described in the following formation chart appearing in defendants' registration statement filed with the SEC on a Form S-1/A on December 7, 2004 ("December 2004 Registration Statement"):



30.    In accordance with the above chart, defendants intended as a result of the IPO to (i) issue shares to purchasers in the IPO pursuant to the offering, (ii) issue shares to existing predecessor company Great Lakes, and (iii) issue restricted shares to "formation transactions participants," with the sale of the restricted shares subject to a subsequent registration statement and prospectus. As a result, defendants planned to issue 14,000,000 shares subject to the IPO registration statement and 14,033,501 restricted shares, the actual sale to non-affiliates then subject to a separate subsequent registration statement.

31.    From a time prior to the IPO, Great Wolf Resorts developed experience with and used "Adjusted EBITDA" as a key non-GAAP financial measure, useful to predict the Company's performance and business prospects. Defendants defined this measure as net income plus (a) interest expense, net, (b) income taxes, (c) depreciation and amortization, (d) non-cash employee compensation, (e) costs associated with early extinguishment of debt and (f) pre-opening costs of resorts under development.

32.    Additionally, the company defined another non-GAAP financial measure, "Adjusted net income," as net income without the effects of (a) non-cash employee compensation, (b) costs associated with early extinguishment of debt, and (c) pre-opening costs of resorts under development.

## UNTRUE STATEMENTS OF MATERIAL FACT
## AND MATERIAL OMISSIONS IN
## <u>GREAT WOLF RESORTS'S REGISTRATION STATEMENTS</u>

**IPO Registration Statement**

33.      On December 7, 2004, the Company filed its December 2004 Registration

Statement in connection with its IPO. The filing stated in part:

Non-GAAP Financial Measures

We use EBITDA as a measure of our operating performance. EBITDA is a supplemental non-GAAP financial measure. EBITDA is commonly defined as net income plus (a) interest expense, (b) income taxes and (c) depreciation and amortization.

EBITDA as calculated by us is not necessarily comparable to similarly titled measures by other companies. In addition, EBITDA (a) does not represent net income or cash flows from operations as defined by GAAP; (b) is not necessarily indicative of cash available to fund our cash flow needs; and (c) should not be considered as an alternative to net income, operating income, cash flows from operating activities or our other financial information as determined under GAAP.

*We believe EBITDA is useful to an investor in evaluating our operating performance because:*

• a significant portion of our assets consists of property and equipment that are depreciated over their remaining useful lives in accordance with GAAP. Because depreciation and amortization are non-cash items, we believe that presentation of EBITDA is a useful measure of our operating performance;

• *it is widely used in the hospitality and entertainment industries to measure operating performance without regard to items such as minority interests and gain on sale of real estate; and*

• we believe it helps investors meaningfully evaluate and compare the results of our operations from period to period by removing the impact of items directly resulting from our asset base, primarily depreciation and amortization, from our operating results.

*Our management uses EBITDA:*

• *as a measurement of operating performance because it assists us in comparing our operating performance on a consistent basis as it removes the impact of items directly resulting from our asset base, primarily depreciation and amortization and non-recurring or unusual items, from our operating results;*

- 11 -

• *for planning purposes, including the preparation of our annual operating budget;*

• *as a valuation measure for evaluating our operating performance and our capacity to incur and service debt, fund capital expenditures and expand our business; and*

• *as one measure in determining the value of other acquisitions and dispositions.*

*We also expect that covenants in our new revolving credit facility will require us to meet financial tests based upon EBITDA.*

Using a measure such as EBITDA has material limitations. These limitations include the difficulty associated with comparing results among companies and the inability to analyze certain significant items, including depreciation and interest expense, which directly affect our net income or loss. Management compensates for these limitations by considering the economic effect of the excluded expense items independently, as well as in connection with its analysis of net income.

The tables shown below reconcile net loss to EBITDA for the periods presented.

Consolidated Pro Forma

| | Nine Months Ended September 30, 2004 | Year Ended December 31, 2003 |
|---|---|---|
| Net (loss) | $(465 ) | $(646 ) |
| Adjustments: | | |
| Interest expense, net | 4,092 | 3,173 |
| Income tax expense (benefit) | (310 ) | (431 ) |
| Depreciation and amortization | 15,105 | 15,327 |
| EBITDA | $18,422 | $17,423 |

Predecessor

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2004 | 2003 | 2003 | 2002 | 2001 |
| Net income (loss) | $(4,961 ) | $1,177 | $(4,543 ) | $(6,755 ) | $(1,177 ) |
| Adjustments: | | | | | |
| Interest expense, net | 5,130 | 4,205 | 6,542 | 2,920 | 3,468 |
| Income tax expense | — | — | — | — | — |
| Depreciation and amortization | 9,569 | 6,731 | 10,440 | 4,169 | 3,996 |
| EBITDA | $9,738 | $12,113 | $12,439 | $334 | $6,287 |

Dells/Sandusky

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
| | 2004 | 2003 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Net income (loss) | $3,167 | $4,189 | $2,116 | $2,822 | $(2,214) |
| Adjustments: | | | | | |
| Interest expense, net | 3,424 | 3,502 | 4,666 | 4,896 | 5,086 |
| Income tax expense | — | — | — | — | — |
| Depreciation and amortization | 5,552 | 5,752 | 8,090 | 8,414 | 8,764 |
| EBITDA | $12,143 | $13,443 | $14,872 | $16,132 | $11,636 |

***

## Subsequent Registration Statement

34.     On February 10, 2005, the Company filed a registration statement with the SEC on a Form S-1/A ("February 2005 Registration Statement") in connection with 14,032,896 shares of Great Wolf Resorts common stock being sold by selling stockholders who were issued restricted shares of stock during the IPO. The filing stated in part:

Non-GAAP Financial Measures

We use EBITDA as a measure of our operating performance. EBITDA is a supplemental non-GAAP financial measure. EBITDA is commonly defined as net income plus (a) interest expense, (b) income taxes and (c) depreciation and amortization.

EBITDA as calculated by us is not necessarily comparable to similarly titled measures by other companies. In addition, EBITDA (a) does not represent net income or cash flows from operations as defined by GAAP; (b) is not necessarily indicative of cash available to fund our cash flow needs; and (c) should not be considered as an alternative to net income, operating income, cash flows from operating activities or our other financial information as determined under GAAP.

*We believe EBITDA is useful to an investor in evaluating our operating performance because:*

- 13 -

• a significant portion of our assets consists of property and equipment that are depreciated over their remaining useful lives in accordance with GAAP. Because depreciation and amortization are non-cash items, we believe that presentation of EBITDA is a useful measure of our operating performance;

• *it is widely used in the hospitality and entertainment industries to measure operating performance without regard to items such as minority interests and gain on sale of real estate; and*

• we believe it helps investors meaningfully evaluate and compare the results of our operations from period to period by removing the impact of items directly resulting from our asset base, primarily depreciation and amortization, from our operating results.

*Our management uses EBITDA:*

• *as a measurement of operating performance because it assists us in comparing our operating performance on a consistent basis as it removes the impact of items directly resulting from our asset base, primarily depreciation and amortization and non-recurring or unusual items, from our operating results;*

• *for planning purposes, including the preparation of our annual operating budget;*

• *as a valuation measure for evaluating our operating performance and our capacity to incur and service debt, fund capital expenditures and expand our business; and*

• *as one measure in determining the value of other acquisitions and dispositions.*

*Covenants in our revolving credit facility also require us to meet financial tests based upon EBITDA.*

Using a measure such as EBITDA has material limitations. These limitations include the difficulty associated with comparing results among companies and the inability to analyze certain significant items, including depreciation and interest expense, which directly affect our net income or loss. Management compensates for these limitations by considering the economic effect of the excluded expense items independently, as well as in connection with its analysis of net income.

The tables shown below reconcile net loss to EBITDA for the periods presented.

| | Consolidated Pro Forma | |
| | Nine Months Ended September 30, 2004 | Year Ended December 31, 2003 |
| --- | --- | --- |
| Net (loss) | $(465 ) | $(646 ) |
| Adjustments: | | |
| Interest expense, net | 4,092 | 3,173 |
| Income tax expense (benefit) | (310 ) | (431 ) |
| Depreciation and amortization | 15,105 | 15,327 |
| EBITDA | $18,422 | $17,423 |

Predecessor

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | 2004 | 2003 | 2003 | 2002 | 2001 |
| Net income (loss) | $(4,961 ) | $1,177 | $(4,543 ) | $(6,755 ) | $(1,177 ) |
| Adjustments: | | | | | |
| Interest expense, net | 5,130 | 4,205 | 6,542 | 2,920 | 3,468 |
| Income tax expense | — | — | — | — | — |
| Depreciation and amortization | 9,569 | 6,731 | 10,440 | 4,169 | 3,996 |
| EBITDA | $9,738 | $12,113 | $12,439 | $334 | $6,287 |

Dells/Sandusky

| | Nine Months Ended September 30, | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | 2004 | 2003 | 2003 | 2002 | 2001 |
| Net income (loss) | $3,167 | $ 4,189 | $ 2,116 | $ 2,822 | $ (2,214 ) |
| Adjustments: | | | | | |
| Interest expense, net | 3,424 | 3,502 | 4,666 | 4,896 | 5,086 |
| Income tax expense | — | — | — | — | — |

| Depreciation and amortization | | | | | |
|---|---|---|---|---|---|
| | 5,552 | 5,752 | 8,090 | 8,414 | 8,764 |
| EBITDA | | | | | |
| | $ 12,143 | $ 13,443 | $ 14,872 | $ 16,132 | $ 11,636 |

\*\*\*

35.    Defendants' discussion of its use and reliance upon EBITDA in its December 2004 and February 2005 Registration Statements contained untrue statements of material fact or omitted to state a material fact required to be stated therein or necessary to make the facts stated therein not misleading, for the following reasons. First, defendants lacked effective process management and systems essential for the accurate accounting of "revenue/operating" expenses, particularly its non-GAAP EBITDA measure, which served to make quarterly and annualized guidance based on this measure misleading. This problem persisted long after the IPO, resulting in overstatement of quarterly and annualized EBITDA projections. Defendants thus concealed the *tenuous nature* of their attempts to periodically determine the EBITDA measure with certainty, making their use of the measure *inherently unreliable for most business purposes.*

36.    Second, defendants represented that they actually relied upon the EBITDA measure for planning purposes, including the preparation of an annual operating budget, evaluation of operating performance, capacity to incur and service debt, fund capital expenditures to expand the business as one measure in determining the value of other acquisitions and dispositions.   Therefore, since defendants' EBITDA number was inherently unreliable, the value of defendants' underlying business was in doubt, to the extent this defective measure was used for valuation purposes, *to convince investors to buy the Company's stock during the IPO.* Finally, defendants' use of the measure to meet "financial tests" required to obtain additional financing was misleading, since defendants' ability to periodically determine the EBITDA measure was inherently unreliable.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## MADE DURING THE CLASS PERIOD

37.     On December 14, 2005, the Company issued a press release entitled,

"Great Wolf Resorts, Inc. Announces Initial Public Offering of Common Stock at $17.00

Per Share."  The press release stated in part:

> Great Wolf Resorts, Inc. (NASDAQ: WOLF) today announced the pricing of its initial public offering of 14,000,000 shares of its common stock at a price of $17.00 per share. The Company has granted the underwriters an option to purchase up to 2,100,000 additional shares of common stock from the Company to cover over-allotments, if any. The offering is expected to close on December 20, 2004.
>
> Citigroup Global Markets Inc. is the sole book-running manager, with A.G. Edwards & Sons, Inc., Raymond James & Associates, Inc., Calyon Securities (USA) Inc., Société Générale and ThinkEquity Partners LLC acting as co-managers for the offering.
>
> A registration statement relating to these securities has been filed with and declared effective by the Securities and Exchange Commission. This press release shall not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of these securities in any state or jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction.   The offering of these securities is made only by means of a prospectus, copies of which may be obtained by contacting the prospectus department of Citigroup Global Markets Inc., Brooklyn Army Terminal, 140 58th Street, Brooklyn, NY 11220.

***

38.     The December 2004 Registration Statement described and incorporated by

reference in defendants' press release of December 14, 2004 was false and misleading for

the following reasons. First, on or before this date, defendants lacked effective process

management and systems essential for the accurate accounting of "revenue/operating"

expenses, particularly its non-GAAP EBITDA measure. This would tend to make

defendants' determinations of EBITDA inherently unreliable for use in defendants'

routine course of business. Thus, defendants' initial offering operated as a fraud upon

investors, since defendants' defective processes and systems undermined the accuracy and therefore the predictive value of defendants' EBITDA results.

39. Second, defendants explained that they relied upon the Company's EBITDA measure *for their critical business needs,* including planning purposes, the preparation of an annual operating budget, evaluation of operating performance, capacity to incur and service debt, and fund capital expenditures to expand the business as one measure in determining the value of other acquisitions and dispositions. Thus, defendants gave credibility to the EBITDA measure, *explaining both the "proper use" and importance of the measure to investors.* However, since process management and systems essential for the accurate quarterly and annualized projection of the EBITDA measure at the Company were both deficient and defective, this left investors with the false and misleading impression that the EBITDA projections were accurate, reliable and had predictive value.

40. The February 2005 Registration Statement, containing nearly identical language as the December 2004 Registration Statement, was false and misleading for the following reasons. First, defendants lacked effective process management and systems essential for the accurate accounting of "revenue/operating" expenses, particularly its non-GAAP EBITDA measure. Defendants' determinations of EBITDA thus remained inherently unreliable for use in defendants' routine course of business. Although defendants continued in their efforts to credit the "proper use" and importance of the measure to investors, process management and systems essential for accurate quarterly and annualized projections of EBITDA remained deficient and defective.

41. On May 5, 2005, defendants issued a press release entitled, "Great Wolf Resorts Reports First-Quarter 2005 Earnings." The press release stated in part:

> Great Wolf Resorts, Inc. (NASDAQ: WOLF), the nation's largest owner, operator and developer of drive-to family resorts featuring indoor waterparks and other family-oriented entertainment activities, today reported results for the quarter ended March 31, 2005.

***

Outlook and Guidance

The company provides the following outlook and earnings guidance for the second, third, and fourth quarters and for the full year 2005 (amounts in thousands, except per share data):

|  | Second Quarter | | Third Quarter | |
| --- | --- | --- | --- | --- |
|  | Low | High | Low | High |
| Net income (loss) | $(400) | $200 | $9,700 | $10,900 |
| Net income (loss) per diluted share | $(0.01) | $0.01 | $0.32 | $0.36 |
| Adjusted EBITDA (a) | $8,000 | $9,000 | $25,400 | $27,400 |
| Adjusted net income (loss) (a) | $(100) | $500 | $10,300 | $11,500 |
| Adjusted net income per diluted share | $0.00 | $0.02 | $0.34 | $0.38 |

|  | Fourth Quarter | | Full Year 2005 | |
| --- | --- | --- | --- | --- |
|  | Low | High | Low | High |
| Net income (loss) | $(1,400) | $(800) | $5,600 | $8,000 |
| Net income (loss) per diluted share | $(0.05) | $(0.03) | $0.18 | $0.26 |
| Adjusted EBITDA (a) | $9,500 | $10,500 | $50,000 | $54,000 |
| Adjusted net income (loss) (a) | $(560) | $40 | $10,400 | $12,800 |
| Adjusted net income (loss) per diluted share | $(0.02) | $0.00 | $0.34 | $0.42 |

For reconciliations of Adjusted EBITDA and Adjusted net income (loss), see the tables accompanying this press release.

***

42.     Defendants' press release of May 5, 2005 was false and misleading, since defendants' inherently flawed and defective processes and systems resulted in *inaccurate*

*results for EBITDA that lacked true predictive value.* Investors attempting to determine the financial progress and prospects of the Company were thus unable to do so, based on the quarterly and annualized projections defendants provided in their press release. Had defendants admitted the truth about its inherently unreliable methods to determine EBITDA, in fact that their EBITDA projections lacked predictive value, or had defendants in fact reliably predicted much lower EBITDA results; the news would have removed inflation from the value of the stock.

43.     On June 14, 2005, defendants issued a press release entitled, "Great Wolf Resorts Announces Updated Earnings Guidance for Second Quarter and Full Year 2005." The press release stated in part:

> Great Wolf Resorts, Inc. (NASDAQ: WOLF), the nation's largest owner, operator and developer of drive-to family resorts featuring indoor waterparks and other family-oriented entertainment activities, today announced that the company is revising its earnings guidance for the second quarter and the full year 2005.
>
> The company's revised earnings guidance for the second, third and fourth quarters and for the full year 2005 is as follows (amounts in thousands, except per share data):

| | Second Quarter | Third Quarter | |
| --- | --- | --- | --- |
| | | Low | High |
| Net income (loss) | $(1,000) | $9,000 | $10,200 |
| Net income (loss) per diluted share | $(0.03) | $0.30 | $0.34 |
| Adjusted EBITDA (a) | $7,000 | $24,400 | $26,400 |
| Adjusted net income (loss) (a) | $(700) | $9,600 | $10,800 |
| Adjusted net income (loss) per diluted share | $(0.02) | $0.32 | $0.36 |

|  | Fourth Quarter | | Full Year 2005 | |
|---|---|---|---|---|
|  | Low | High | Low | High |
| Net income (loss) | $(2,000) | $(1,400) | $3,700 | $5,500 |
| Net income (loss) per diluted share | $(0.07) | $(0.05) | $0.12 | $0.18 |
| Adjusted EBITDA (a) | $8,500 | $9,500 | $47,000 | $50,000 |
| Adjusted net income (loss) (a) | $(1,160) | $(560) | $8,500 | $10,300 |
| Adjusted net income (loss) per diluted share | $(0.04) | $(0.02) | $0.28 | $0.34 |

(a) For reconciliations of Adjusted EBITDA and Adjusted net income (loss), see the tables accompanying this press release.

*"With the upcoming expiration on June 18 of the lock-up period from our IPO, we felt it appropriate to update our second quarter and full year earnings guidance with our most recent view of operating results," said John Emery, chief executive officer. "Our goal is to provide an updated picture of our current expectations for the second quarter and the remainder of the year."*

"Although our first quarter results were ahead of our original projections as a result of the Easter holiday and related school spring breaks falling in the first quarter this year, our budgeting expectations for 2005 underestimated the total impact of this shift on our second quarter results," Emery said. "Additionally, in the Sandusky market our Great Wolf Lodge resort has been impacted by a significant increase in the number of competitive rooms of indoor waterpark resorts. During the second quarter of 2004, our 271-room resort was the only indoor waterpark resort in that market, while today indoor waterpark resorts have more than 800 rooms in this market. As a result of the increase in competitive pressure in this market, our Sandusky resort's results in the second quarter were negatively impacted, and we expect that situation to continue to affect the resort's operating results through the remainder of 2005. Our long-term view on the Sandusky market is positive based on our experience with competition in the Wisconsin Dells market. We expect the new supply in the Sandusky market will be absorbed by a gradual increase in overall demand over time."

*As a result of these factors, the company has decreased its second quarter Adjusted EBITDA projection from a range mid-point of $8.5 million to $7.0 million, and reduced its full year Adjusted EBITDA guidance from a range mid-point of $52.0 million to a range mid-point of $48.5 million.*

***

44.     Defendants' press release of June 14, 2005 was false and misleading for the following reasons. First, defendants' inherently flawed and defective processes and systems served to grossly understate its EBITDA.  Defendants reported not more than $1.5 million of an overall $5.2 million earnings miss, based on the Company's original $8.5 million adjusted EBITDA mid-point projection. Worse, the Company's downward adjustment of its full year adjusted EBITDA guidance missed the mark by as much as $18 million. Had defendants admitted the truth about its inherently unreliable methods to determine EBITDA, in fact that the EBITDA projection lacked predictive value, or had defendants in fact reliably predicted much lower EBITDA results, the news would have removed inflation from the value of the stock, *at the very time of the expiration of the IPO lockup period.*

45.     Moreover, removal of inflation from the value of the stock would have also impacted those shareholders selling an aggregate number of 14,032,896 shares of Great Wolf Resorts stock. These sales were pursuant to a registration statement entirely separate from that relied upon for the IPO, specifically defendants' February 2005 Registration Statement, and defendants' prospectus supplement on SEC Form 424B3, filed June 1, 2005. These filings were made *on behalf of literally hundreds of shareholders,* listed on pages 96 through 109 of the February 2005 Registration Statement. Amongst the listed selling shareholders were nearly 20 employees of the Company. *Finally, amongst those employee holdings were tens of thousands of shares held by defendants.*

46.     On June 30, 2005, a Citigroup Smith Barney analyst report pointed to an upbeat meeting with defendants and included an analysis of EBITDA, stating in part:

SUMMARY

On 6/29, we met with CEO John Emery and COO Kim Schaefer in New York.This note contains highlights from our meeting, which was generally positive.

The return characteristics of WOLF's new JV project seem very attractive. WOLF will receive disproportionate economics due to mgmt fees and pay minimal taxes (Tribal land). We estimate 21% ROI and 43% ROE for WOLF.

The pipeline appears strong and mgmt believes there are at least another 20-25 good locations in the US. 2007 projects could be announced by year-end. Our sense is WOLF is targeting the Northeast, Mid-Atlantic, California and Dallas.

Longer-term, management suggested the possibility of selling stabilized assets and recycling capital. This could allow WOLF to accelerate unit growth beyond 2-3 resorts/year, without equity. We think this is at least 2-3 years away.

Management is very focused on building its brand, which could create a competitive marketing advantage & long-term value. Reaffirm 1H/$26 target.

***

Overhang. Prior to June 18 lock-up expiration, pre-IPO investors owned 14.0 million shares, or 46.3% of the company. This includes 4.8 million shares held by insiders, 2.5 million held by Craig Stark and Eric Lund, who were employees of WOLF's predecessor company, but left after the IPO, and 6.7 million held by about 500 retail investors. It is unclear whether any of these shares have been sold yet.

***

- 23 -

Our adjusted EBITDA valuation analysis is presented below.

| Current 2005E Valuation: | | | Target 2006E Valuation: | 2006E EBITDA | Target Multiple | Value |
|---|---|---|---|---|---|---|
| **Current Trading Value:** | | | **Property** | | | |
| Equity Market Value | $ | 606.8 | Resort EBITDA | $ 76.7 | 12.5x | $ 958.4 |
| Construction in Progress | | (60.3) | Franchise and Marketing Fees | 1.7 | 13.5x | 22.5 |
| Long-Term Debt | | 171.3 | Corporate Overhead | (14.0) | 12.4x | (173.6) |
| Cash | | (24.2) | **REPORTED EBITDA** | 64.3 | 12.5x | 807.3 |
| **Enterprise Value** | | 693.6 | | | | |
| Adjusted EBITDA | | 52.6 | Cincinnati Adjustment [1] | 11.3 | 12.5x | 140.6 |
| **2006E EBITDA Multiple** | | 13.2x | **ADJUSTED EBITDA** | 75.6 | 12.5x | 947.9 |

## **THE TRUTH IS REVEALED**

47.     On July 26, 2005, in the midst of the day's trading session, the stock reporting service newratings.com published an A.G. Edwards & Sons article stating that analysts at AG Edwards had downgraded Great Wolf Resorts *from "hold" to "sell."*

48.     Thus, not only had defendants provided a false and misleading account on June 14, 2005 of the circumstances behind the Company's earnings shortfall, that information now stood in stark contrast to the sudden shift in sentiment within the investment community, serving to accurately predict *far worse news* of the true extent of the Company's problems and earnings shortfall than the market expected. Prior to this news, the market appeared *to credit the veracity and limited effect* of defendants' negative earnings warning. In fact, following defendants' June 14, 2005 disclosure, the interim price of the stock actually *rose nearly 10%,* to $22.33 on July 22, 2005.

49.     Then, on July 28, 2005, defendants issued a shocking press release entitled, "Great Wolf Resorts Reports Second-Quarter 2005 Earnings." The press release stated in part:

> Great Wolf Resorts, Inc. (NASDAQ:WOLF - News), the nation's largest owner, operator and developer of drive-to family resorts featuring indoor waterparks and other family-oriented entertainment activities, today reported results for the quarter ended June 30, 2005. Management said that results were below the company's previously announced second quarter guidance due to a combination of factors, including a slower than expected start to the summer season in the Midwest; competitive pressures at its

- 24 -

Sandusky, Ohio resort; and a slower-than-expected occupancy ramp up at the company's Sheboygan, Wis. property.

For the quarter ended June 30, 2005, the company reported (amounts in thousands, except per share data):

| Net income (loss) | $(2,533) |
| Net income (loss) per diluted share | $(0.08) |
| Adjusted EBITDA | $3,261 |
| Adjusted net income (loss) | $(2,492) |
| Adjusted net income (loss) per diluted share | $(0.08) |
| Revenues | $26,032 |

Adjusted EBITDA and Adjusted net income (loss) are non-GAAP financial measures within the meaning of the Securities and Exchange Commission (SEC) regulations. See the discussion below in the "Non-GAAP Financial Measures" section of this press release. Reconciliations of Adjusted EBITDA and Adjusted net income (loss) are provided in the tables of this press release.

\*\*\*

"We experienced a difficult quarter as a result of both external and internal factors," said John Emery, chief executive officer. "External factors impacting results included market conditions and increased competition. *Internal factors included the timing and flow of operational information to provide accurate forecasts and the lack of visibility of our customer booking patterns.*

\*\*\*

*"Internally, we are implementing enhanced financial and operations reporting so we can recognize shifting booking patterns more quickly. We recently hired Rajiv Castellino, a hospitality industry technology veteran, as our new chief information officer to improve on current information, reporting and analysis systems.*

\*\*\*

Key Financial Data

As of June 30, 2005, Great Wolf Resorts had:

Total cash and cash equivalents of $34.3 million

Total secured debt of $105.3 million

- 25 -

Total unsecured debt of $51.5 million

Weighted average cost of total debt of 7.4 percent

Weighted average debt maturity of 15 years

Outlook and Guidance

The company provides the following revised outlook and earnings guidance for the third and fourth quarters and for the full year 2005 (amounts in thousands, except per share data):

|  | 3Q 2005 | | 4Q 2005 | | Full year 2005 | |
|---|---|---|---|---|---|---|
|  | Low | High | Low | High | Low | High |
| Net income (loss) | $5,850 | $7,650 | $(4,100) | $(2,300) | $(3,000) | $500 |
| Net income (loss) per diluted share | $0.19 | $0.25 | $(0.14) | $(0.08) | $(0.10) | $0.02 |
| Adjusted EBITDA (a) | $19,000 | $22,000 | $5,000 | $8,000 | $34,400 | $40,400 |
| Adjusted net income (loss) (a) | $6,450 | $8,250 | $(3,300) | $(1,500) | $1,500 | $5,100 |
| Adjusted net income (loss) per diluted share | $0.21 | $0.27 | $(0.11) | $(0.05) | $0.05 | $0.17 |

(a) For reconciliations of Adjusted EBITDA and Adjusted net income

(loss), see the tables accompanying this press release.

*"We are revising our guidance downward for the third and fourth quarters to reflect conditions that we encountered during the second quarter,"* Emery said. "We are taking what we believe to be the important, necessary steps to mitigate the impact of the issues we are facing. The 2005 summer vacation pattern is troubling in the short term, but we believe the adjustments we are making will have long-range benefits for the company."

\*\*\*

50.     Thus, the Company's shocking announcement of July 28, 2005 proved that the earlier reports were in fact true - the Company's problems and earnings shortfall *were far worse than previously revealed.* The magnitude of the earnings shortfall was *$3.7 million below* the revised guidance of $7.0 million that the Company had provided

in mid-June. Moreover, defendants now lowered their non-GAAP earnings number for 2005 to fall within the $34 to $40 million range, *between $10 to $13 million lower* than the range of $47 to $50 million that defendants issued in mid-June.

51.    During a conference call conducted prior to the open of the markets, defendants stated in part:

> John Emery  - Great Wolf Resorts - CEO
>
> Thank you, Jerry. Clearly we had a very difficult quarter. I will walk through a lot of detail here in the call and then we will be happy to take questions afterwards. *During the quarter, we saw a convergence of several internal and external operating issues,* which I will discuss in further detail as I walk through my comments.
>
> I want to start with that we are very genuinely disappointed at our inability to meet our revised earnings guidance. Our management team and myself in particular take full responsibility for our earnings estimates and trying to provide as accurate as estimates as possible; and we were not able to do that when we issued our revised estimates on June 14. We did that on June 14 to try to provide a good and updated view of the Company prior to our lock up. So we tried to do the right thing. Unfortunately, we were not as accurate as we would have liked to have been.
>
> Our $3.7 million shortfall from those estimates was due to a couple of things. About $2.3 million of that shortfall was a shift in demand in June. Typically, particularly late June is the start of our very busy season for the summer that we did not forecast. The balance of the difference, in addition to the 2.3 million, *was the result of the timing of the recognition of the flowthroughs from some previous revenue shortfalls.* So we had a couple of issues there that combined for that issue. Many of these issues are within our control, and I will cover some of the specific steps that we are taking to address them shortly.
>
> &#42;&#42;&#42;
>
> *I really look at our issues in two broad categories; one I would call revenue/operating and the other is process management and systems.* They really do go hand-in-hand. We are a revenue-driven business, but our ability to react to shifts, whether it's a shift in demand in terms of how we market our properties, or a shift in demand in terms of how we run expenses on our properties, a lot of this deals in timing of information. So it is not just revenue, it is making sure our process and information flow is a management tool, not just a historical tool. That is a conversion process that frankly has been in place as we have grown here in transition to a public company. *We are just not caught up to where we need to be.* I will talk about that in a second.
>
> &#42;&#42;&#42;

*We are also creating several additional positions in our operating group to provide more depth and detailed analysis necessary to help recognize and adjust for shifting demand patterns. We need to get a little more systematic in how we do things.* We are a Company that came up knowing every property and what was happening at it every day. As we have grown, with the addition of the pressures of being a public company, we need to get a little more systematic in how we approach some of this. Because we can't have as thin a team as we have right now who are making those adjustments.

*The systems and processes, the second part of our issue, in regards to the visibility of shifting patterns, it is really a timing thing.* We obviously have good numbers. There's no mistake in our numbers. This is not an issue where we figured out we made a mistake in the way we calculated something. It is simply the timing of recognizing what is happening at the properties and the timing of the historical numbers. We need to improve on that.

We were not expecting to do updated forecast in the quarter, and we got kind of caught up, and we did our best to make estimates, and we missed those estimates. But *what we need is a system that provides that data,* not just for this type of situation we wound up in this quarter, but also as a management tool for Kim and her team to help them not just recognize shifts but react to those shifts more quickly.

One of the tough things in June is the bottom-line impact of our revenue shift was really big because we did not do a great job in managing the cost, because *we didn't recognize it soon enough.* Given that same revenue shift, with a little more leadtime, we would be able to mitigate it much better. But you can't do it without much leadtime. *So it's a combination of providing data to the operating group to give them time to adjust for that, that will mitigate some of these issues.*

I know, given the discussion we are having here, it doesn't appear that way, but a lot of the financial stuff was already in-process. It is not really reacting to the issues of the second quarter. It is simply getting all this stuff in place once you're a public company. Looking back you always wish you had done more faster. But the reality is, we have been public for six months, trying to catch up with all that, and just the Sarbanes-Oxley.

We just changed accounting systems. We hired a CIO to help put in better systems. We have added several financial positions. All this is in place not as a result of what we figured out over the last couple weeks, but has been in-process for the last two or three months. *But we need to get it executed a little more quickly. It is not that difficult a task to figure out what you need to do. But we need to execute it, and we need to execute it quickly.*

***

*But we do need to keep our operating team more focused on running this business.* So we have tried to create estimates that allow our operating team to focus on what is best for the business, and not wondering every day where everything is versus a forecast, which has been a tough time for

us the past month or so here. Part of my job is making sure that we keep that focus on the business.

\*\*\*

Jim Calder  - Great Wolf Resorts - CFO

Thank you, John. I just have a couple very brief comments on Q2 results on capital structure and on the outlook and guidance. As we discussed in the release today, the quarter was very difficult, as John talked about, and led to financial results that were well below what we expected.

*On an adjusted basis, we had EBITDA of 3.3 million; and that was 3.7 million below the revised guidance of 7.0 million that we had provided in mid-June.* Our results for impacted by all the factors that John has outlined, so I won't go into them in more depth here.

\*\*\*

On outlook guidance, in the earnings release we provide guidance for the full-year 2005 revised guidance and for each of the quarters in the second half of the year. Our forecast for the full year is for adjusted EBITDA in the 34 to $40 million range; and that is down from the range of 47 to $50 million that we issued in mid-June.

*As John mentioned in his remarks, many of the issues that we encountered in the second quarter are going to continue in the second half of the year, and we're dealing with them as best we can right now. We're taking a lot of steps to mitigate these factors, but based on current trends and our latest forecast of revenues and expenses, we feel the new lower guidance is the appropriate thing to issue at this point.*

\*\*\*

Also due to the volatility in some of the booking patterns and other operational trends we have seen during the second quarter, we have widened the ranges for adjusted EBITDA guidance for Q3 and Q4; again just to make it a little more reasonable and reflect some of those market conditions. That is the conclusion of our remarks. Operator, we will take questions at this time.

\*\*\*

Michael Rietbrock  - Smith Barney - Analyst

*What is the timeline on which you're going to get those reporting systems up to speed, so you know what the flowthroughs in more real-time?*

John Emery  - Great Wolf Resorts - CEO

*The timeline is effectively now. The people are in place, the accounting system is in place. It is really more a process than systems for this*

*particular issue. It really is the process of making sure we are monitoring all this stuff the way it relates to our public forecast.*

Jim Calder  - Great Wolf Resorts - CFO

This is Jim. John is exactly right. We have the systems now in place where going forward we will have very good, very complete bottom-line information for each of the properties by about the 15th at the latest of the following month. *John is right, what we're working on now is the communication aspects of that information internally, the analysis of it, and those types of things.* So the systems are in place, we have the people in place, and that is basically effective immediately.

John Emery  - Great Wolf Resorts - CEO

Fortunately, we're really focused on the process more than the systems. Because the actual mechanical systems and people systems to do it are there, but we've got to get the process working much more fluently.

*** 

Gary McDaniel  - Standard & Poor's - Analyst

*You can't give a dollar number on what you expect ADR to look like on a systemwide level in the second quarter?*

John Emery  - Great Wolf Resorts - CEO

*I can't do it right now, because I would have to tie it into the ranges that we have given. That is the problem I had; I can't back into all that.* (multiple speakers)

Gary McDaniel  - Standard & Poor's - Analyst

Okay. How many events have utilized the meeting space in Sheboygan to date? How many events have used the meeting space in Sheboygan? Has that been a big draw?

John Emery  - Great Wolf Resorts - CEO

I don't have an event count here in front of me. I can --

Gary McDaniel  - Standard & Poor's - Analyst

A rough idea is fine.

John Emery  - Great Wolf Resorts - CEO

The meeting space at Sheboygan has been successful as a social ballroom. What we're trying to build is a conference business that is more midweek. So it has done a good job bringing in business in certain respects. What we're looking for is for that to fill in the September-October, the April-Mays, when the (indiscernible) is not there midweek.

- 30 -

*We have changed our head of sales there to accommodate that.* That change was literally I think a month ago. So we expect to see better numbers, but the conference booking business is at least a six-month-out business. So we're seeing some improvement for the fall. September looks okay. November right now still a little slow, but we have five months to pick that up. So we're seeing improvement there. But I don't exact numbers for you.

Gary McDaniel  - Standard & Poor's - Analyst

*Okay. Given the second-quarter problems you cited in not recognizing the revenue shortfall soon enough, the budgeting problems you noted in Williamsburg, has that made you question your rapid expansion plans at all? Can you really grow as quickly as you're planning and still adequately manage this business?*

John Emery  - Great Wolf Resorts - CEO

I believe that our expansion plans that we have planned are still well within what we can execute economically still (indiscernible) right for this business. I can tell you, we absolutely between management and our Board have discussed that topic. We will continue to discuss as the go forward. One of the things we will do, I will give you an example, is we may make sure that we space out every opening to have at least 60 to 90 days between openings.

We want to be very careful that we do this right. The development side is going very well. The projects that we have -- and just to be clear at Williamsburg, Williamsburg had a little flowthrough issue, but in terms of the big scheme of things, Williamsburg is doing great. So I wouldn't categorize Williamsburg as having a budget issue per se. I wanted to comment that is one of the things that we focused on. That by itself would not have created a second-quarter issue for us.

Gary McDaniel  - Standard & Poor's - Analyst

*Right, okay. But my question is, if you are having problems managing business in six hotels, how are you going to manage eight, and then how are you going to manage 10, 12, 14?*

John Emery  - Great Wolf Resorts - CEO

*That is a completely appropriate question.* I do believe that we have the right leadership in place. I also believe we need to add depth and bench strength below that leadership. We've got the right people that know where this business needs to go. *What we don't have yet, even for our six properties, is a system underneath all those people that can bifurcate the day-to-day, the development, the branding. That is what we need to start doing.*

\*\*\*

Jeff Randall  - A.G. Edwards - Analyst

*Okay. With the new hires for marketing and probably some there for internal controls, can you give sort an order of magnitude increase in G&A from, say, the 2Q '05 run rate? Just to give us an idea as to how much that is going to go up over the balance of the year.*

John Emery  - Great Wolf Resorts - CEO

*You know what is frustrating is it really isn't that material. You're talking about adding a handful of bodies.* The ones that we talked about for internal controls are already in place. They were already in the G&A. The people are here. The problem we had there wasn't really number of people. It was what they were focused on. They spent so much time -- I am not blaming this -- but Sarbanes-Oxley and all this other stuff has sucked up so much time from everybody, from our property controllers on up through corporate that it's unbelievable. *We underestimated what it would take to be in compliance with that.*

*It's not like we have control issues. We have timing issues, because we haven't been able to focus them properly.* From a G&A standpoint the positions we are covering (ph) for Kim's group, you are talking about a few hundred grand in total a year. It is not -- that is where you're kicking yourself a little bit. It is -- *we have been trying to grow (indiscernible) and kind of make sure we are bringing the right people in and doing it prudently, not because of cost but because of integration. That caught up with us here, and we are going to need to integrate a little faster than we originally had planned.*

\*\*\*

Bill Crow  - Raymond James - Analyst

*John, when did you guys become aware that -- I assume you get daily reports of occupancy from your properties. When did you become aware that you weren't going to hit the guidance that you had given?*

John Emery  - Great Wolf Resorts - CEO

Well, we did a little reforecast ourselves in late June, about the 23rd, and we still felt we were on track to make the bottom line. We knew revenue was a little soft but we thought we could make the bottom-line. But we didn't know our bottom-line impact until July.

Bill Crow  - Raymond James - Analyst

*I'm just curious because I know you went out and marketed to a bunch of clients at the end of June and clearly I would believe at that point you would know what occupancy trends have looked like. And I guess I'm a little surprised that you were at the very end of July and there was no preannouncement given the materiality of the miss (ph).*

John Emery  - Great Wolf Resorts - CEO

*I absolutely agree with that.* And we did our best prior to going out to get comfortable that we were still okay with the numbers that were out there because we absolutely would have changed them if we thought we needed to. And that's why I said at the very beginning of this call, look, this isn't just about the June numbers being off, we had not caught up with where our bottom-line numbers were on a timely basis to where we should have been looking back at what was going on.

We make no bones about that. We absolutely did not have the knowledge or visibility that we would have liked to have had at that point in time looking back. *And then when the bottom-line numbers started rolling in based off where the final numbers came in June, it wasn't where we had obviously expected it to be. And that's our fault. We're not blaming anybody but ourselves for not having a better handle on that.*

\*\*\*

Bill Crow  - Raymond James - Analyst

*John, clearly there is management issues here with either communication between the properties and headquarters or amongst headquarters people. It seems like that would be an issued* [sic] *that is exasperated by having split off offices with the management team in two different locations. Have you considered consolidating the management functions in one location?*

John Emery  - Great Wolf Resorts - CEO

*Bill, that is a fair question.* Just to be clear, though, the only person split that works out of two offices really is that we have our treasury group in Virginia. Everybody else is based here. Jim Calder is here, Kim's here, Hernan's here, I am based here. I do spend typically one day a week in Virginia and typically travel two days a week. So I'm typically -- I'm in Madison, unless there's other (indiscernible), I'm in Madison every week. You know the way my job is. My job is 80% travel, whether it's wherever it is or whatever I am doing.

\*\*\*

52.     Following   the   shocking   revelations   contained   within   defendants'

conference call of July 28, 2005, investor confidence in the credibility of management to

provide a true and accurate accounting of the Company's business prospects all but

evaporated. Given the circumstances, defendants could do little else but admit their

defective   corporate   controls   and   compliance   issues,   as   to   the   accounting   of

"revenue/operating" expense and in the areas of "process management and systems".

Worse, analysts reached another shocking conclusion, that defendants *were fully aware*

*of the true magnitude of the earnings miss when they were out marketing clients at the end of June, but failed to publicly disclose the materiality of the problem at that time.*

53.     Finally, when pressed, defendants admitted that it was time *to correct the defective nature of its longstanding process and system issues:*

Michael Rietbrock  - Smith Barney - Analyst

*What is the timeline on which you're going to get those reporting systems up to speed, so you know what the flowthroughs in more real-time?*

John Emery  - Great Wolf Resorts - CEO

*The timeline is effectively now. The people are in place, the accounting system is in place. It is really more a process than systems for this particular issue. It really is the process of making sure we are monitoring all this stuff the way it relates to our public forecast.*

54.     On the news of July 28, 2005, the price of the Company's stock plunged $6.12, to $13.65, on extremely heavy volume of 6.0 million shares. The nearly 31% decline in Great Wolf Resorts's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud suddenly being revealed to investors and the market. The shocking disclosure and magnitude of Great Wolf Resorts's stock price decline negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

55.     During the same period in which Great Wolf Resorts's stock price fell almost 31% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was flat. The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Great Wolf Resorts's stock price and the subsequent significant decline in the value of Great Wolf Resorts's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

56.    During the Class Period, defendants knew and concealed that:

(a)    deficient and defective internal operational controls were in existence at the Company;

(b)    the Company's deficient and defective internal operational controls concealed a true picture of the Company's financial progress and business prospects, both during and from a time prior to the beginning of the Class Period;

(c)    the Company's own earnings warning of June 14, 2005 understated the true extent of the Company's earnings shortfall and negative impacts to its 2005 guidance;

(d)    the Company's own false and misleading earnings warning served to maintain inflation of the price of the stock upon expiration of the lockup period for selling shareholders involved in formative transactions in connection with the IPO;

(e)    while the materiality of the issues was hidden from investors, an awareness of the true magnitude of the earnings miss colored marketing activities during the Class Period, and

(f)    investors would not learn the truth about the true nature of the Company's earnings shortfall, stalled business prospects or its deficient and defective internal operational controls until the end of the Class Period.

**POST-CLASS PERIOD REVELATIONS**

57.    As if to underscore the truth regarding the Company's effective concealment of its adverse business and financial issues from its prior guidance, on August 1, 2005, *The Motley Fool* published an article entitled "Great Wolf Not So Great." The article stated in part:

> Disappointment has a funny way of sneaking up behind you, bumping you behind the knees, and scrambling away as you hit the ground. I'm a shareholder in Great Wolf Resorts (Nasdaq: WOLF), and that's pretty much what happened to me last week. The young leader in

hotels with massive indoor water parks announced that a dreadful start to its key summer season meant that it was likely to miss its targets for the rest of the year. This came on the heels of warning back in June that it would post a loss of $0.03 a share for its second quarter.

*The kicker here is that the quarter came in far worse than that. The company wound up losing $0.08 a share for the period as occupancy rates were down throughout the hotelier's lodges. It's not every day that you see a company disappoint investors twice over the same quarter.*

*It gets worse, though. Two days earlier, A.G. Edwards put out a sell rating on the stock. I'm usually suspicious when analysts make a radical move so close to an earnings announcement. What do they know? Did somebody tip them off? I admit I was caught off guard here. I figured the company had already warned back in June and that it would have spoken up again if its watered-down projections were overly ambitious.* I had also seen cases like an analyst downgrading Google (Nasdaq: GOOG) and Yahoo! (Nasdaq: YHOO) just before they went on to zoom past Wall Street's bottom-line expectations.

I shouldn't have let my guard down. The folks at A.G. Edwards clearly did their homework this time. Maybe they were scouting out the various locations and came to the logical conclusion that bookings were off this summer. Once A.G. Edwards issued the sell recommendation so close to the company's earnings report, though, Great Wolf should have come clean and broken the bad news to everyone ahead of the actual earnings report on Thursday morning.

So how can you trust management here? This company just went public in December and it has already alienated investors and soiled its publicly traded reputation. Those stains don't exactly come off in the wash. The company is going to spend a lot of time to win that kind of confidence back -- or bite the bullet right away and bring in new management that can distance itself from this poorly executed mess.

What makes this even more bothersome is that earlier this year, I singled out the stock as a worthy investment for our Motley Fool Rule Breakers newsletter. It's not the first call that hasn't exactly panned out for the research service's subscribers. Past picks like Taser Systems (Nasdaq: TASR) and BioSante Pharmaceuticals (AMEX: BPA) have also taken their lumps.

Still, because 13 of the other 19 stocks have produced double-digit returns since being featured in the newsletter, the average return of all 22 selections since Rule Breakers' launch last October is a hearty 12%. That's more than twice the market's return in that time. You may want to check out some of those winners if you want to cheer yourself up.

As for Great Wolf, it may be in for a rough patch the next time it needs to raise money to fund new resorts. This is one Wolf that bit the hand that fed it -- and then kept gnawing at it like a soup bone. That's a pity because indoor water parks remain all the rage and Great Wolf

seemed to have the right stuff to make it happen in this promising niche in the otherwise sleepy lodging industry.

***

## VIOLATIONS OF REGULATIONS G, S-K AND S-B

58.     Effective March 28, 2003, the SEC adopted new rules and amendments to address public companies' disclosure or release of certain financial information that is calculated and presented on the basis of methodologies other than in accordance with generally accepted accounting principles (GAAP). "Non-GAAP financial measures" are non-GAAP numerical measures of a registrant's historical or future financial performance, financial position or cash flows.

59.     The Individual Defendants themselves repeatedly stated that the non-GAAP numerical measures in question in this complaint – EBITDA and adjusted net income (loss) – were important financial measures. Indeed, defendants represented that EBITDA was a primary financial measure of the Company's historical and future financial performance, financial position, cash flows and credit worthiness. An example of the Individual Defendants' statements is as follows:

Defendants' Press Release of July 28, 2005:

Included in this press release are certain "non-GAAP financial measures," which are measures of the company's historical or future performance that are different from measures calculated and presented in accordance with GAAP, within the meaning of applicable SEC rules, that Great Wolf Resorts believes are useful to investors. They are as follows: (i) Adjusted EBITDA and (ii) Adjusted net income (loss). The following discussion defines these terms and presents the reasons the company believes they are useful measures of its performance.

Great Wolf Resorts defines Adjusted EBITDA as net income plus (a) interest expense, net, (b) income taxes, (c) depreciation and amortization, (d) non-cash employee compensation, (e) costs associated with early extinguishment of debt and (f) pre-opening costs of resorts under development. The company defines Adjusted net income as net income without the effects of (a) non-cash employee compensation, (b) costs associated with early extinguishment of debt, and (c) pre-opening costs of resorts under development.

Adjusted EBITDA and Adjusted net income as calculated by the company are not necessarily comparable to similarly titled measures by other companies. In addition, adjusted EBITDA (a) does not represent net income or cash flows from operations as defined by GAAP, (b) is not necessarily indicative of cash available to fund the company's cash flow needs, and (c) should not be considered as an alternative to net income, operating income, cash flows from operating activities or the company's other financial information as determined under GAAP. Also, Adjusted net income does not represent net income as defined by GAAP.

Management believes Adjusted EBITDA is useful to an investor in evaluating the company's operating performance because a significant portion of its assets consists of property and equipment that are depreciated over their remaining useful lives in accordance with GAAP. Because depreciation and amortization are non-cash items, management believes that presentation of Adjusted EBITDA is a useful measure of the company's operating performance. Also, management believes measures such as Adjusted EBITDA are widely used in the hospitality and entertainment industries to measure operating performance.

Similarly, management believes Adjusted net income is a useful performance measure because certain items included in the calculation of unadjusted net income may either mask or exaggerate trends in the company's ongoing operating performance. Furthermore, performance measures that include these types of items may not be indicative of the continuing performance of the company's underlying business. Therefore, the company presents Adjusted EBITDA and Adjusted net income because they may help investors to compare Great Wolf Resorts' ongoing performance before the effect of various items that do not directly affect the company's ongoing financial performance.

60.     Thus, defendants regularly and systematically referred to their non-GAAP EBITDA and adjusted net income measures as being important financial-performance drivers. According to the defendants themselves, these were non-GAAP financial measures that were critical to understanding the Company's financial performance.

61.     Regulation G applies whenever a registrant with the SEC, or a person acting on its behalf, discloses publicly or releases publicly any material information that includes a non-GAAP financial measure. Similarly, the amendments to Item 10 of Regulation S-K and Item 10 of Regulation S-B apply to all registrants using non-GAAP financial measures in filings with the SEC. According to the Final Rule adopted by the SEC:

Disclosure pursuant to Regulation G that is materially deficient may, in addition to violating Regulation G, give rise to a violation of Section 10(b) or Rule 10b-5 thereunder if all the elements for such a violation are present. In this regard, we reminded companies in December 2001 that, under certain circumstances, non-GAAP financial measures could mislead investors if they obscure the company's GAAP results. We continue to be of the view that some disclosures of non-GAAP financial measures could give rise to actions under Rule 10b-5.

Section 3(b) of the Sarbanes-Oxley Act provides that a violation of that Act or the Commission's rules thereunder shall be treated for all purposes as a violation of the Exchange Act.

62.     Regulation G includes the general disclosure requirement that a registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

63.     Defendants violated Regulation G because:

(i)     they took it upon themselves to publicly disclose, and indeed emphasize their non-GAAP EBITDA and adjusted net income measures, as financial measures that were critical to understanding and assessing the Company's financial performance;

(ii)     the Company used deficient and defective raw financial data, processes and systems to generate their non-GAAP EBITDA and adjusted income measures; and

(iii)     the Company actually disclosed its non-GAAP EBITDA and adjusted net income in a manner which was materially false and misleading in light of the circumstances under which they were presented.

64.     In addition, the amendments to Item 10 of Regulation S-K and Item 10 of Regulation S-B require registrants using non-GAAP financial measures in filings with the Commission to provide a statement disclosing the reasons why the

registrant's management believes that presentation of the non-GAAP financial measure provides useful information to investors regarding the registrant's financial condition and results of operations.

65.     Defendants eagerly fulfilled Item 10 of Regulation S-K and S-B's requirement to explain why non-GAAP EBITDA and adjusted income provide useful information to investors.  However, the Company used deficient and defective raw financial data, processes and systems to generate their non-GAAP EBITDA and adjusted income measures. Thus, defendants' assertions regarding the "usefulness" of their deceptive measures only furthered their fraud.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD-ON-THE-MARKET DOCTRINE

66.     At all relevant times, the market for Great Wolf Resorts securities was an efficient market for the following reasons, among others:

(a)     Great Wolf Resorts's stock met the requirements for listing, and was listed and actively traded on the Nasdaq National Market, a highly efficient and automated market;

(b)     As a regulated issuer, Great Wolf Resorts filed periodic public reports with the SEC; and

(c)     Great Wolf Resorts regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

67.     As a result of the foregoing, the market for Great Wolf Resorts's securities promptly digested current information regarding Great Wolf Resorts from all publicly

available sources and reflected such information in Great Wolf Resorts's stock price. Under these circumstances, all persons who purchased or acquired Great Wolf Resorts's securities during the Class Period suffered similar injury through their purchase of the aforementioned securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

68.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Great Wolf Resorts who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

69.    Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23, on behalf of all persons and entities who purchased the common stock of Great Wolf Resorts pursuant or traceable to the Company's IPO of common stock on December 14, 2004, and on behalf of all persons and entities who purchased or otherwise acquired Great Wolf Resorts securities between December 14, 2004 and July 28, 2005,

inclusive.  Excluded from the Class are defendants, any entity in which a defendant has or had a controlling interest, and members of defendants' families.

70.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Great Wolf Resorts had more than 30 million shares of stock outstanding, owned by thousands of persons.  There were also 14,000,000 shares of Great Wolf Resorts common stock sold pursuant to the Company's December 2004 Registration Statement/Prospectus and 14,033,501 shares sold   pursuant   to   the   separate   subsequent   February   2005   Registration Statement/Prospectus, as well as all prior registration statements/prospectus of the same. Record owners and other class members may be identified from records maintained by Great Wolf Resorts and/or its transfer agents and may be notified of the pendency of the action by mail, using a form customarily used in securities class actions.

71.     There is a well-defined community of interest in the questions of law and fact involved in this case.  There are no conflicts between plaintiff and the Class, and plaintiff's claims are typical of those of other Class members.  The questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members include the following:

(a)     Whether §§ 11, 12(a)(2) and 15 of the Securities Act, and §§ 10(b) and 20(a) of the Exchange Act were violated by Great Wolf Resorts and the Individual Defendants;

(b)     Whether defendants misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the defendants knew or should have known that their statements were false and misleading;

(e)     Whether the prices of Great Wolf Resorts securities were artificially inflated during the Class Period; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  Furthermore, the damages suffered by individual Class members may be relatively small, and the expense and burden of litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.  Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class and securities litigation.

## COUNT I

### For Violation of § 11 of the Securities Act Against Defendant
### Great Wolf Resorts And The Individual Defendants

73.     Plaintiff incorporates ¶¶ 1-36, 49, 51 and 58-65 by reference. Plaintiff for purposes of this claim disclaims any allegations of intentional misconduct or fraud. Plaintiff asserts only strict liability and negligence claims in this cause of action.  This claim is brought on behalf of all those who acquired Great Wolf Resorts securities at the time of the initial public offering, issued pursuant to the IPO and "selling shareholder" December 2004 and February 2005 Registration Statements, inclusive of all prior versions of the same, who were damaged thereby, seeking to pursue remedies under the Securities Act.  Each of the Individual Defendants named in this cause of action were Great Wolf Resorts officers, directors and/or signatories of the Registration Statements. Defendant Great Wolf Resorts is liable as the issuer of the Registration Statements. Each of the Individual Defendants named in this cause of action signed the Registration Statement and all amendments thereto, which contained untrue statements of material fact

or omitted to state facts required to be stated therein or necessary to make the statements therein not misleading, and are each liable under § 11(a)(1) and (2).

74.     Each of the defendants named in this cause of action is liable under § 11(a) because the Registration Statements/prospectus of December 7, 2004, and February 10, 2005, inclusive of all prior versions of the same contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  Each of the defendants named in this cause of action owed to the purchasers of Great Wolf Resorts stock, including plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective, to ensure that they were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  In the exercise of reasonable care, these defendants knew or should have known of the material misstatements and omissions contained in these Registration Statements.  None of the defendants named in this cause of action made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and did not omit any material facts and were not misleading.  Each of the defendants named in this action caused to be issued and participated in the issuance of the materially false and misleading statements in the Registration Statements, which misrepresented or failed to disclose, *inter alia*, the adverse facts set forth above.  Thus, defendants violated § 11 of the Securities Act and are strictly liable.

75.     The Individual Defendants signed, or authorized signing on their behalf, these Prospectus/Registration Statements.  Because the Registration Statements contained untrue statements of material fact or omitted to state a material fact required to be stated therein or necessary to make the facts stated therein not misleading, each of these defendants is liable as "a person who signed the Registration Statement," under § 11(a)(1), 15 U.S.C. § 77k(a)(1).

76.     The Individual Defendants were directors of Great Wolf Resorts when the December 2004 and February 2005 Registration Statements/prospectus, and all prior versions of the same and inclusive of all documents referenced therein, contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the facts stated therein not misleading.  The Individual Defendants are each liable as a director under § 11(a)(2), 15 U.S.C. § 77k(a)(2).

77.     Plaintiff acquired Great Wolf Resorts securities pursuant and traceable to the Registration Statements without knowledge of the untruths or omissions alleged herein, and sustained damages as a result.  Plaintiff and the other members of the Class could not have reasonably discovered the nature of defendants' untruths and omissions.

78.     This action was brought within the applicable statute of limitations.

## COUNT II

### For Violation of § 12(a)(2) of the Securities Act
### Against Defendant Great Wolf Resorts

79.     Plaintiff incorporates ¶¶ 1-36, 49, 51, 58-65 and 73-78 by reference. Plaintiff for purposes of this claim disclaims any allegations of intentional misconduct or fraud.  Plaintiff asserts only strict liability and negligence claims in this cause of action.

80.     On December 7, 2004 and February 10, 2005, Great Wolf Resorts filed Registration Statements in connection with the Company's initial public offering.  From and after December 7, 2004, all of Great Wolf Resorts agents' subsequent written and oral statements alleged herein give rise to § 11 and § 12(a)(2) Securities Act liability under SEC regulations.

81.     The Company's December 2004 and February 2005 Registration Statements/prospectus, inclusive of all prior versions of the same, contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Great Wolf Resorts owed plaintiff the duty to make a reasonable and diligent

investigation of the statements contained in its Prospectus/Registration Statements to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Great Wolf Resorts, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus/Registration Statements as set forth above.

82.     Great Wolf Resorts did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Prospectus/Registration Statements were true and did not omit any material facts and were not misleading.

83.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus/Registration Statements at the time of the IPO.

84.     By reason of the conduct alleged herein, Great Wolf Resorts violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, plaintiff sustained substantial damages in connection with its purchases of Great Wolf securities pursuant to the Company's prospectus/Registration Statements.

85.     This action was brought within the applicable statute of limitations.

## COUNT III

### For Violation of § 15 of the Securities Act Against the Individual Defendants

86.     Plaintiff incorporates ¶¶ 1-36, 49, 51, 58-65, and 73-85 by reference.  The Individual Defendants, by reason of their positions with Great Wolf Resorts and/or stock ownership were controlling persons of Great Wolf Resorts and are liable under § 15 of the Securities Act.  Specifically,

(a)     Defendant Neviaser had the power and authority to control Great Wolf Resorts by virtue of his position as Chairman of the Board of Directors of Great Wolf Resorts.

(b)     Defendant Emery had the power and authority to control Great Wolf Resorts by virtue of his position as CEO and director of Great Wolf Resorts.

(c)     Defendant Calder had the power and authority to control Great Wolf Resorts by virtue of his position as Chief Financial Officer of the Company.

(d)     Defendants Blutinger, Churchey, Knetter, Nolan, Silver and Vaccaro had the power and authority to control Great Wolf Resorts by virtue of their respective positions as members of Great Wolf Resorts' board of directors.

87.     None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus/Registration Statements were true and devoid of any misstatements or omissions of material fact.  Therefore, by reason of his or her position of control over the Company, as alleged herein, each of the Individual Defendants is liable jointly and severally with and to the same extent that Great Wolf Resorts is liable to plaintiff and the other members of the Class as a result of the conduct alleged herein.

## COUNT IV

### For Violation of § 10(b) of the Exchange Act and
### Rule 10b-5 Against Great Wolf Resorts and the Individual Defendants

88.     Plaintiff incorporates ¶¶ 1-8 and 16-87 by reference.

89.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 47 -

90.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases or acquisitions of Great Wolf Resorts securities during the Class Period.

91.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Great Wolf Resorts securities during the Class Period. Plaintiff and the Class would not have purchased, acquired or exchanged Great Wolf Resorts securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

92.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases and acquisitions of Great Wolf Resorts securities during the Class Period.

## COUNT V

### For Violation of § 20(a) of the Exchange Act
### Against Great Wolf Resorts and the Individual Defendants

93.     Plaintiff incorporates ¶¶ 1-8 and 16-92 by reference.

94.     The Individual Defendants prepared, or were responsible for preparing, the Company's press releases and SEC filings. By reason of their positions as directors and/or officers of Great Wolf Resorts they had the power and authority to cause Great Wolf Resorts to engage in the wrongful conduct complained of herein. Great Wolf

- 48 -

Resorts controlled each of the Individual Defendants and all of its employees. By reason of such wrongful conduct, the Individual Defendants and Great Wolf Resorts are liable pursuant to § 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

95. WHEREFORE, plaintiff on behalf of itself and the Class, pray for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding plaintiff and other members of the Class compensatory damages;

C. Awarding plaintiff and members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

D. Awarding plaintiff and other members of the Class such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 21, 2005

**s/K. Scott Wagner**
K. Scott Wagner, SBN 1004668
Attorney for Plaintiff
HALE & WAGNER, S.C.
205 East Wisconsin Avenue, Suite 300
Milwaukee, WI 53202
**Telephone**: (414) 278-7000
**Facsimile**:  (414) 278-7590
**Email**:      ksw@halewagner.com

**SCOTT + SCOTT, LLC**
David R. Scott
Neil Rothstein
108 Norwich Avenue
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432

- and –

**SCOTT + SCOTT, LLC**
Arthur L Shingler III
600 B Street, Suite 1500
San Diego, CA  92101
Telephone:  (619) 233-4565
Facsimile:  (619) 233-0508

**MILBERG WEISS BERSHAD
   & SCHULMAN LLP**
Steven S. Schulman
Peter E. Seidman
One Pennsylvania Plaza
New York, New York  10119-0165
Telephone:  (212) 594-5300
Facsimile  (212) 868-1229

**Counsel for Plaintiff**